SHORT HAUL SURVIVAL
COMMITTEE, Petitioner,

v.

UNITED STATES of America and the
Interstate Commerce Commission,
Respondent.

A–C BERWICK TRANSPORTERS, INC.,
et al., Petitioner,

v.

UNITED STATES of America and the
Interstate Commerce Commission,
Respondent.

AMERICAN TRUCKING ASSOCIA-
TIONS, INC., Petitioners,

v.

UNITED STATES of America and the
Interstate Commerce Commission,
Respondent.

Nos. 77–1070, 77–1774 and 77–2083.

United States Court of Appeals,
Ninth Circuit.

March 17, 1978.

Edward K. Wheeler, Washington, D. C. (argued), for Int'l Brotherhood of Teamsters, etc.

Robert L. Hurtig, Portland, Or. (argued), for City of Portland, Oregon.

Frederick W. Read, III, Washington, D. C. (argued), for respondents and for USA & ICC.

D. Robert Thomas, Winnetka, Ill. (argued), for Freight Forwarders Inst., et al.

Daniel J. Sweeney, Los Angeles, Cal. (argued), for Nat'l Small Shipments Traffic, etc.

Arthur L. Winn, Jr., Washington, D. C. (argued), for Pat Authority of New York & New Jersey

Gary Dunbar, Washington, D. C. (argued), for Regular Common Carrier Conference, etc.

Before DUNIWAY and KILKENNY, Circuit Judges, and JAMESON,* District Judge.

DUNIWAY, Circuit Judge:

These are petitions to set aside a report and order issued by the Interstate Commerce Commission in Ex Parte No. MC-37 (Sub-No. 26), *Commercial Zones and Terminal Areas*, 1976, 128 M.C.C. 422. In that proceeding the Commission adopted new rules for determining geographic boundaries of commercial zones and terminal areas. In No. 77-1070, the Short Haul Survival Committee, an *ad hoc* committee of the Local and Short Haul Carriers National Conference of the American Trucking Associations, Inc., petitioned for review of the Commission's report and order in this court. In Nos. 77-1774 and 77-2038, petitions for review were filed in the Third Circuit and the District of Columbia Circuit, respectively, by A-C Berwick Transporters, Inc., *et*

David A. Sutherlund, Washington, D. C. (argued), for petitioners and for Short Haul Survival Committee, etc.

Todd A. Peterman, Washington, D. C. (argued), for American Trucking Association.

Thomas F. X. Foley, Colts Neck, N. J. (argued), for A-C Berwick Transporters, et al.

Donald Murchison, Beverly Hills, Cal. (argued), for Auto Fast Freight, etc.

* The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

*al.*, a group of short-haul carriers active in the greater New York metropolitan area, and by the American Trucking Associations, Inc. These petitions were transferred to this court pursuant to 28 U.S.C. § 2112(a). Numerous parties have intervened in the litigation, some supporting and others challenging the rules adopted by the Commission. We decline to set aside the Commission's report and order, and we affirm it.

## I.

## THE COMMISSION PROCEEDING

In its December 17, 1976 decision in Ex Parte No. MC–37 (Sub-No. 26), *Commercial Zones and Terminal Areas, supra,* which we refer to as the Report, the Commission modified its rules defining the geographic boundaries of "commercial zones" and "terminal areas" as those terms are used in sections 203(b)(8) and 202(c) of the Interstate Commerce Act, 49 U.S.C. §§ 303(b)(8) and 302(c). The Commission first resorted to rule making to define the scope of commercial zones and terminal areas in the mid 1940's, and its proceedings culminated in the adoption of a "population-mileage" formula for commercial zones in 1946, Ex Parte No. MC–37, *Commercial Zones and Terminal Areas,* 46 M.C.C. 665, and for carriers' terminal areas in *Commercial Zones and Terminal Areas,* 1952, 54 M.C.C. 21 (Sixth Supplemental Report, Ex Parte No. MC–37). Since 1946, the Commission has decided 43 cases involving defining specifically the limits of particular zones.

By 1975, the Commission felt that circumstances throughout the nation had changed so much that a new rule making procedure was appropriate. The procedure was begun on August 12, 1975, by publication of a notice in the Federal Register suggesting a new formula and inviting the submission of written data, views and arguments. The response was widespread, and the Commission issued an Interim Report (Ex Parte No. MC–37 (Sub-No. 26), *Commercial Zones and Terminal Areas,* 124 M.C.C. 130) on December 18, 1975. The interim report of 55 pages plus appendices stated tentative conclusions and invited further filings. Again,

the response was widespread. There were over 600 responses, and a massive record was compiled, consisting of 23 large volumes. The final Report, adopting a new population-mileage formula, issued on December 17, 1976. It covers 134 pages in the record, plus a lengthy appendix, and carefully analyzes the issues and the data and views submitted by the many parties who filed them.

The new rules took effect on April 8, 1977. They bring up to date the 1946 population-mileage formula to reflect the tremendous urban expansion which the nation has experienced during the last three decades. In addition to expanding substantially the commercial zones and terminal areas of cities with populations of 200,000 or more, the Commission's order greatly simplifies the old rules by making the revised population-mileage formula applicable to 42 cities, the zones of which were previously individually described. The old and new population-mileage formulae are as follows:

| Municipal Population | 1946 Boundaries * | New Boundaries * |
|---|---|---|
| less than 2,500 | 2 | 3 |
| 2,500 to 24,999 | 3 | 4 |
| 25,000 to 99,999 | 4 | 6 |
| 100,000 to 199,999 | 5 | 8 |
| 200,000 to 499,999 | 5 | 10 |
| 500,000 to 999,999 | 5 | 15 |
| 1 million or more | 5 | 20 |

\* Miles measured from municipal limits.

## II.

## THE STATUTORY FRAMEWORK

Section 203(b)(8) of the Interstate Commerce Act, 49 U.S.C. § 303(b)(8), establishes a contingent exemption from federal regulation of interstate motor transportation. In pertinent part the statute provides:

. . . nor, unless and to the extent that the Commission shall from time to time find that such application is necessary to carry out the national transportation policy declared in this Act, shall the provisions of this chapter . . . apply to:

(8) The transportation of . . . property in interstate or foreign com-

merce wholly within a municipality or between contiguous municipalities *or within a zone adjacent to and commercially a part of any such municipality or municipalities,* except when such transportation is under a common control, management, or arrangement for a continuous carriage or shipment to or from a point without such municipality, municipalities, or zone . . . . [emphasis supplied]

Three types of local movements in interstate or foreign commerce are thus exempted from federal regulation. The geographic meaning of the first two types of local movements—those carried out "wholly within a municipality" or "between contiguous municipalities"—derives from political boundaries and is thus readily ascertainable. It requires no further definition by the Commission. However, the scope of the third type of exempt movement—that carried out "within a zone adjacent to and commercially a part of" the base municipality—does pose definitional problems and is the subject of the rule making proceeding with which we are here concerned.

The section 203(b)(8) exemption applies only to local carriage in and around those cities situated near state lines because similar traffic elsewhere is already exempt from federal regulation because of its intrastate character. However, the geographic limits of commercial zones are of broader significance because the Commission employs them in administering other sections of the Act. Most importantly, commercial zone boundaries are used to construe certificates of operating authority so that, for example, a carrier authorized to operate between San Francisco and Seattle may carry goods between those two cities' commercial zones.

Section 202(c) of the Act, 49 U.S.C. § 302(c), complements the commercial zone exemption by excluding from Commission regulation transfer, collection and delivery services performed within the "terminal areas" of line-haul carriers in connection with line-haul operations. The 202(c) exemption allows local cartage operators to contract with or act as agents for regulated line-haul carriers when performing such services within the carriers' terminal areas. The Commission has long defined commercial zones and terminal areas coextensively. This simplifies administration of the two exemptions and makes good sense because "if commercial zone limits mark the limits of an industrial, business, or residential community, then they also mark the limits of the areas which can be served in *bona fide* collection and delivery service and beyond which any service takes on the character of a line-haul. . . ." *Commercial Zones and Terminal Areas, supra,* 54 M.C.C. 21, 63.

III.

## THE PROPRIETY OF RULE MAKING RATHER THAN ADJUDICATION

■ This is an obvious case for the exercise of rule making rather than adjudicatory proceedings. As the Commission recognized in the 1946 decision (46 M.C.C. at 677), there is a potential commercial zone around every one of the thousands of municipalities in the United States. To define, in a separate proceeding, each of those zones, would be at worst impossible, and at best an enormous waste of time, energy and talent that could be better spent in other activities, or even in doing nothing at all. This kind of problem can only be handled by rule making—a legislative type of activity.

It follows that there is no merit in the argument of intervening petitioners Auto Fast Freight, *et al.,* a group of short-haul motor carriers, that in expanding the scope of commercial zones the Commission was required to hold the oral hearings mandated by section 212(a) of the Act, 49 U.S.C. § 312(a). Characterizing the Commission's action as "individual in impact and condemnatory in purpose," they maintain that the Commission has revoked their certificates and was obliged to conduct adjudications with all of the procedural formalities mandated by 5 U.S.C. § 554.

*American Airlines, Inc. v. CAB,* 1966, 123 U.S.App.D.C. 310, 359 F.2d 624, *cert. denied,*

1966, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75, involved a similar challenge to agency rule making. The court squarely rejected the challenge, characterizing rule making as "a vital part of the administrative process" which ought "not to be shackled, in the absence of clear and specific Congressional requirement, by importation of formalities developed for the adjudicatory process and basically unsuited for policy rule making." 359 F.2d at 629. It noted that

> [w]e are not here concerned with a proceeding that in form is couched as rule making, general in scope and prospective in operation, but in substance and effect is individual in impact and condemnatory in purpose. The proceeding before us is rule making both in form and effect. There is no individual action here masquerading as a general rule.

359 F.2d at 631.

Here, as in *American Airlines*, we deal with a good-faith exercise of administrative rule making authority. The Commission was not obliged to proceed by adjudication merely because its action affected carriers individually and in some cases adversely.

Section 212(a) of the Interstate Commerce Act, 49 U.S.C. § 312(a), which authorizes the Commission to amend carrier certificates only after "notice and hearing," does not require a different result. That section must be read with section 208(a) of the Act, 49 U.S.C. § 308(a), which expressly authorizes the Commission to impose general conditions on the exercise of privileges granted by certificates of operating authority. *See, Thompson Van Lines, Inc. v. United States*, D.D.C., 1975, 399 F.Supp. 1131, 1136, *aff'd*, 1976, 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630.

## IV.

### THE SCOPE OF REVIEW

■ The scope of review is highly circumscribed because petitioners are challenging the product of a rule making proceeding. Our inquiry is limited to determining whether the Commission's order is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This is a "highly deferential" standard of review which "presumes agency action to be valid," *Ethyl Corp. v. Environmental Protection Agency*, 1976, 176 U.S.App.D.C. 373, 406, 541 F.2d 1, 34, *cert. denied*, 1976, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 and which imposes upon petitioners the "heavy burden" of showing that the Commission acted unreasonably in updating the old population-mileage formula. *American Public Power Association v. F.P.C.*, 1975, 173 U.S. App.D.C. 36, 522 F.2d 142, 146. In reviewing the challenged order we may not substitute our judgment for that of the Commission, *Citizens to Preserve Overton Park v. Volpe*, 1971, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 and we must affirm if a rational basis for the agency's action is demonstrated. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 1974, 419 U.S. 281, 290, 95 S.Ct. 438, 42 L.Ed.2d 447. As the Supreme Court stated recently in reviewing another product of Commission rule making,

> [w]e do not weigh the evidence introduced before the Commission; we do not inquire into the wisdom of the regulations that the Commission promulgates, and we inquire into the soundness of the reasoning by which the Commission reaches its conclusions only to ascertain that the latter are rationally supported.

*United States v. Allegheny-Lublum Steel Corp.*, 1972, 406 U.S. 742, 749, 92 S.Ct. 1941, 1946, 32 L.Ed.2d 453.

Petitioner Short Haul Survival Committee exhorts us to apply the "substantial evidence" test of 5 U.S.C. § 706(2)(E) in reviewing the Commission's action. The Commission says that the substantial evidence standard of review is "simply not applicable here." We agree that 5 U.S.C. § 706(2)(E) is, by its terms, inapplicable. However, we also tend to agree with the Second Circuit's characterization of a similar controversy over the appropriate scope of judicial review as "semantic in some degree" and largely lacking in "dispositional importance." *Associated Industries of*

245

*New York State, Inc. v. United States Department of Labor,* 2 Cir., 1973, 487 F.2d 342, 349. As Judge Friendly noted in that case, "it is difficult to imagine a decision having no substantial evidence to support it which is not 'arbitrary' or a decision struck down as arbitrary which is in fact supported by 'substantial evidence' . . . ." 487 F.2d at 349.

## V.

### RATIONALITY OF THE COMMISSION'S ACTION

■ The best proof of the rationality of the Commission's action is to be found in the Report and the Interim Report that preceded it. It is unfair to the Commission to assert, as some of the petitioners and intervenors do, that the Commission became bemused by demographic data which, like Gilbert's "flowers that bloom in the spring" have "nothing to do with the case." The two reports demonstrate that the Commission relied heavily upon economic data, and concluded, quite rationally in the light of the record, that those data, like the more complete and detailed demographic data, support the conclusions at which the Commission arrived. It would be quite impossible for us to say that the Commission's conclusions are not rationally supported. Indeed, we might well conclude that a contrary result would *not* be rationally supported.

Petitioner Short Haul Survival Committee objects to the "blanket effect" of the rules promulgated by the Commission, arguing that the revised population-mileage formula "becomes purely arbitrary" when "applied indiscriminately" to all municipalities. Petitioner A–C Berwick, *et al.*, and various intervening petitioners also challenge the broad coverage of the new formula, characterizing its application to the particular zones in which they operate as irrational.

In the *Assigned Car Cases,* 1927, 274 U.S. 564, 47 S.Ct. 727, 71 L.Ed. 1204, the Court rejected a similar challenge to a general rule adopted by the Commission to govern the distribution of railroad cars among coal producers in times of shortage. In language which was quoted with approval in the recent case of *United States v. Allegheny-Ludlum Steel Corp., supra,* 406 U.S. at 749, 92 S.Ct. 1941, the Court responded:

[I]n establishing a rule of general application, it is not a condition of its validity that there be adduced evidence of its appropriateness in respect to every railroad to which it will be applicable. In this connection the Commission, like other legislators, may reason from the particular to the general.

274 U.S. at 583, 47 S.Ct. at 734.

The natural circumstance that the new population-mileage formula will, inevitably, require some fine tuning, does not vitiate its essential rationality. Here, as in the *Assigned Car Cases,* the Commission was privileged to "reason from the particular to the general" and was not required to assess the varying impact of its proposed rules on a myriad of individual zones.

In its report the Commission did, however, analyze in detail the impact of the new formula on major cities which were individually described under the old rules. Report, pp. 98–109. It also established special rules for determining the zones of twin cities, cities with consolidated governments, and cities the zones of which would otherwise be reduced under the new formula. Report, pp. 110–114, 118–119.

In adopting the new population-mileage formula the Commission expressly stated that it was "cognizant of the fact that this general rule will not describe all commercial zones with precision." Report, p. 84. However, because the stated purpose of the rule making proceeding was limited to determining on a "broad basis" whether commercial zones should be expanded, it concluded that claims that the new formula operated inequitably when applied to particular municipalities would be better considered in subsequent petitions seeking individual determinations. The Commission announced its willingness to entertain such petitions and guaranteed consideration "on an expedited basis." Report, p. 85. Those

parties who challenge the application of the new rules to particular municipalities should accept the Commission's explicit invitation and file petitions for special consideration. Attacking the general formula here is not their proper recourse.

## VI.

### CONGRESSIONAL INTENT

■ Petitioner Short Haul Survival Committee characterizes the Commission's action as contrary to the legislative intent underlying section 203(b)(8). The Committee acknowledges that the legislative history of the commercial zone exemption is "scant" but nonetheless makes much of certain introductory remarks to the Motor Carrier Act of 1935 made by Senator Wheeler, then Chairman of the Committee on Interstate Commerce. In his remarks the Senator characterized the commercial zone exemption as applicable to "intramunicipal or occasional operations."

The argument that only "intramunicipal" carriage falls within the commercial zone exemption is contrary to the plain language of the statute. In section 203(b)(8) Congress did exempt transportation carried out "wholly within a municipality" from federal regulation. It did not rest there, however, but went on to exclude from the Act's coverage transportation carried out "within a zone adjacent to and commercially a part of" a base municipality. If these words mean no more than intramunicipal transportation they would be mere surplusage, a result which we do not think that Congress intended.

The Commission's expansion of commercial zones accords fully with the legislative purpose behind the commercial zone exemption of section 203(b)(8). That exemption reflects a policy judgment by Congress that federal intrusion into local transportation is undesirable. Because tremendous urban expansion occurred after 1946 without a corresponding increase in zone limits, the Commission has, in recent years, found itself engaged in the very sort of regulation of local transportation which Congress re-

jected in the Act. To correct that situation and carry out its legislative mandate to "frame a workable delimitation by examining the words of the statute in light of contemporary economic reality and modern transportation needs," Report, p. 56, the Commission adopted the challenged rules.

## VII.

### THE ADJACENCY REQUIREMENT

■ Section 203(b)(8) specifies that an area must be "adjacent to" as well as "commercially a part of" a base municipality if it is to fall within that municipality's commercial zone. Arguing that the newly enlarged zones include areas which are not adjacent to one another, petitioner Short Haul Survival Committee says that the Commission has violated the express criteria of the statute. Numerous intervenors mount a similar attack on the geographic scope of the expanded commercial zones, selecting the most distant points in the zones of the nation's largest cities and arguing that these points are too remote to satisfy section 203(b)(8)'s adjacency requirement.

The argument ignores the meaning of "adjacent": "lying near, close, or contiguous" (Webster II). Indeed, the inner circumference of every zone is not only adjacent to the exterior boundary of the base city, it is contiguous to it—it "adjoins" it. This is more than "adjacent" requires. However, it is still arguable that a portion of the zone, near its exterior circumference, may not be adjacent to the base city.

The key relationship under the statute is the economic nexus between outlying points and the base municipality. Two communities which are neither geographically contiguous nor economically interdependent may nonetheless qualify for inclusion in a single commercial zone if both are "adjacent to" the same city. Conversely, the adjacency requirement precludes inclusion of points remote from a municipality in its commercial zone, notwithstanding the existence of intense economic interaction between them. For example, this effectively rules out a single "Northeast corridor" com-

mercial zone extending from Washington, D. C., to Boston, Massachusetts.

As the Commission concluded in its Report, technological advances in transportation necessarily "engender an element of elasticity with respect to the meaning of 'adjacent.'" Report, p. 61.

> Transportation movements of even 15 or 20 miles beyond city limits do not contradict modern notions of "local movements" in large metropolitan areas. Metropolitan transportation networks of beltways and expressways often span such an area, and these distances can be covered in a matter of minutes.
>
> Report, p. 84.

The Commission properly interpreted section 203(b)(8) as a legislative mandate to reevaluate periodically the scope of the commercial zone exemption in light of changing economic circumstances and technological advances. The newly adopted rules cannot be said to contravene the statutory requirement simply because the expanded zones include communities which are not geographically contiguous to one another.

## VIII.

## THE NATIONAL TRANSPORTATION POLICY

■ Section 203(b)(8) of the Act provides that commercial zone exemption from federal regulation shall apply "unless and to the extent that the Commission shall from time to time find" that regulation "is necessary to carry out the national transportation policy." The National Transportation Policy is set forth in the preamble to the Act, 49 U.S.C. preceding §§ 1, 301, 901 and 1001. It declares, *inter alia*, that the Act shall be administered "to promote safe, adequate, economical, and efficient service"; "to foster sound economic conditions in transportation and among the several carriers"; "to encourage the establishment and maintenance of reasonable charges" without "unfair or destructive competitive practices"; and "to encourage fair wages and equitable working conditions."

Petitioners Short Haul Survival Committee, A–C Berwick, *et al.*, American Trucking Associations, Inc., and numerous intervening petitioners assert that the Commission abused its discretion in concluding that the expansion of commercial zones would promote, rather than frustrate, the goals set forth in the National Transportation Policy. They claim that zone enlargement will drive large numbers of short-haul carriers out of business; that shippers will experience a loss of inexpensive, dependable service as a result; that unregulated carriers operating within the newly expanded zones will pose a safety hazard to the public; and that the new rules will result in lower wages and poorer working conditions for employees of trucking concerns.

Throughout the lengthy proceeding which culminated in the Report, shipper support for larger commercial zones was virtually unanimous. The reasons for this overwhelmingly positive response are not far to seek. Augmented zones and enlarged terminal areas will enable suburban shippers to contract with exempt local carriers, thereby placing them on an equal footing with shippers located within the old zones. The new rules will also enable long-haul carriers to serve suburban shippers directly without the need for costly, time-consuming "interlining." The Commission rationally concluded on the basis of the evidence submitted that zone expansion will result in lower rates, shorter transit times and reduced cargo damage for suburban shippers, thereby fostering the National Transportation Policy's stated goal of "economical and efficient service."

The Commission also concluded that its proposed rules were likely to benefit unregulated local carriers, long-haul carriers and freight forwarders as well. In its Report it noted that the expansion of commercial zones will enable local carriers who were previously confined to the central cities to recapture a share of the business generated by the many shippers who have relocated to the suburbs during the last three decades. The Commission also concluded that the new rules will improve the lot of long-haul

carriers by enabling them to perform more single-line service, and benefit freight forwarders by enlarging the areas within which local cartage operators can act as agents for them in performing collection and delivery services. The Commission did not act irrationally or abuse its discretion in determining that zone expansion would have these salutary effects, thereby fostering "sound economic conditions in transportation and among the several carriers." Substantial record evidence supports the Commission's conclusions.

Petitioners assert that the Commission ignored evidence that the new rules "will have the effect of irreparably injuring short-haul carriers." They predict that "cut-throat competition" in the newly enlarged zones will sharply curtail their revenues and drive many short-haul concerns out of business. The Commission did not ignore the likely impact of the contemplated rule changes on short-haul carriers but rather analyzed the matter carefully in its Report and concluded that as a result of commercial zone expansion,

> [s]hort-haul carriers will experience three types of adverse effects. First, some truck load traffic will be diverted by the ability of long-haul carriers to provide more single-line service. Secondly, they will lose protection from competition on those portions of their service routes encompassed by the expanded zones. Thirdly, in many cases the pecuniary value attached to their operating certificates will be substantially diminished.
>
> Report, p. 128.

While it recognized that increased competition in the expended zones might result in decreased profits for short-haul carriers, the Commission concluded that "the over all benefits to the public of more single-line service and greater flexibility of local operations within urban areas amply justifies our actions in this proceeding." Report, p. 128. We cannot say that the Commission acted irrationally in striking the balance among competing interests in this fashion. As the Supreme Court noted when faced with a similar challenge,

> [t]he Commission's conclusion that consumer benefits outweighed any adverse impact upon the existing carriers reflects the kind of judgment that is entrusted to it, a power to weigh the competing interests and arrive at a balance that is deemed "the public convenience and necessity." *United States v. Pierce Auto Lines,* 327 U.S. 515, 535–536, 66 S.Ct. 687, 697–98, 90 L.Ed. 821 (1946). If the Commission has "drawn out and crystallized these competing interests [and] attempted to judge them with as much delicacy as the prospective nature of the inquiry permits," *ICC v. J–T Transport Co.,* 368 U.S. 81, 89, 82 S.Ct. 204, 209, 7 L.Ed.2d 147 (1961), we can require no more.

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 1974, 419 U.S. 281, 293–94, 95 S.Ct. 438, 446, 42 L.Ed.2d 447.

Petitioners assert that commercial zone expansion is likely to result in a marked decline in highway safety, predicting that "extensive deregulation in and around many of our major cities will induce entry by the inadequately financed who will be forced to cut corners at the expense of safety."

Responsibility for establishing and enforcing highway traffic safety regulations was shifted from the Commission to the Department of Transportation's Federal Highway Administration in 1967. *See,* 49 U.S.C. § 1655(e). Safety rules promulgated by the Federal Highway Administration extend to regulated and unregulated carriers alike and will thus apply in full force to carriers operating within the newly expanded commercial zones. The Highway Administration announced in a notice published in the Federal Register on February 25, 1976, that the Commission's action would not affect coverage of its safety regulations. 41 Fed.Reg. 8175.

The Teamsters Union, an intervening petitioner, claims that zone expansion will lead to lower wages and inequitable working conditions for employees of trucking concerns but marshalls little concrete support for its position. Its arguments must

be evaluated in light of the fact that local exempt carriers, whose scope of operation will be substantially increased as a result of the Commission's action, are often small, family-run enterprises which do not employ union drivers. The Teamsters argue, in effect, that the very existence of these concerns runs counter to the goals expressed in the National Transportation Policy. However, that Policy, which directs the Commission to administer the Act in a manner calculated to promote the public interest generally, rather than the Teamsters' interests specifically, does not prohibit carriers from employing non-union personnel.

## IX.

## THE NATIONAL ENVIRONMENTAL POLICY ACT

 Petitioners Short Haul Survival Committee and A–C Berwick, *et al.*, challenge the adequacy of the environmental impact statement (EIS) prepared by the Commission pursuant to section 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C). In its EIS the Commission concluded that (1) zone expansion will increase the efficiency of long-haul carriers by enabling them to serve the suburbs directly, thereby reducing fuel consumption, air pollution and traffic congestion; (2) heightened competition in the expanded zones will, for a time, cause inefficiencies such as more empty mileage and smaller load factors but these effects will be short-lived because ultimately "only the more efficient operators should survive" in the expanded zones; and (3) zone enlargement will not cause significant numbers of shippers to relocate to the suburbs.

NEPA is "essentially a procedural statute" designed to insure that "agencies will be fully aware of the impact of their decisions when they make them." *Lathan v. Brinegar*, 9 Cir., 1974, 506 F.2d 677, 693. While a reviewing court must ascertain that an agency has taken a "hard look" at the environmental consequences of its action, *Kleppe v. Sierra Club*, 1976, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576, it may not "substitute its judgment for that of the agency as to the necessity or desirability" of taking the contemplated action. *Daly v. Volpe*, 9 Cir., 1975, 514 F.2d 1106, 1108.

In this case we are satisfied that the Commission took a "hard look" at the environmental impact of zone expansion before it acted, and that its EIS was "sufficiently detailed to aid in the substantive decision whether to proceed." *Trout Unlimited v. Morton*, 9 Cir., 1974, 509 F.2d 1276, 1283. It must be remembered that the enlargement of zones is not a physical undertaking akin to the construction of a pipeline, a dam, or roadway. The environmental consequences of the Commission's action cannot be readily determined on the basis of empirical data, as is sometimes the case with more concrete projects. Viewed in the light of this inherent limitation, the Commission's EIS is more than adequate to satisfy NEPA's mandate.

 The City of Portland, Oregon, intervening on behalf of petitioners, argues that commercial zone expansion will interfere with effective land use planning, exacerbating the problem of urban sprawl and undermining certain environmental programs which it has undertaken. While we strongly sympathize with Portland's efforts to contain urban sprawl, the record does not show that the City's goals will be thwarted by the Commission's action. It is possible that commercial zone expansion will encourage shippers to relocate from the central city to outlying areas. Nonetheless, Portland remains free to regulate urban growth by adopting any land use ordinances that it thinks necessary or desirable, and it is free to enlist the assistance of a not unsympathetic state of Oregon, if necessary.

The Report and Order of the Commission are affirmed.