**SEATTLE AUDUBON SOCIETY,**
**et al., Plaintiffs,**

v.

**James R. MOSELEY, et al., Defendants,**

**and**

**Washington Contract Loggers**
**Association, et al.,**
**Intervenors.**

**No. C92–479WD.**

United States District Court,
W.D. Washington,
at Seattle.

May 28, 1992.

Todd D. True, Victor M. Sher, Sierra Club Legal Defense Fund, Seattle, Wash., for plaintiffs.

Christopher Lee Pickrell, U.S. Atty.'s Office, Seattle, Wash., Wells Burgess, Steve O'Dell, U.S. Dept. of Justice, Environment and Natural Resources Div., General Litigation Section, Washington, D.C., for defendants.

Mark C. Rutzick, Preston, Thorgrimson, Shidler, Gates & Ellis, Portland, Or., for intervenors.

ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT, MOTION TO STRIKE, AND MOTION FOR PRELIMINARY INJUNCTION

DWYER, District Judge.

## I.

## INTRODUCTION

On March 7, 1991, this court entered an order in *Seattle Audubon Society v. Evans,* 771 F.Supp. 1081, declaring unlawful a proposal of the United States Forest Service to sell logging rights in national forest habitat areas of the northern spotted owl without complying with the requirements of the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.,* and its implementing regulations. The owl is an "indicator species" under NFMA and a threatened species throughout its range under the Endangered Species Act

("ESA"). The NFMA regulations provide that

> [f]ish and wildlife shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area.

36 C.F.R. § 219.19. *See also* § 219.27(a)(6).

On May 23, 1991, a further order was entered in the *Evans* case directing the Forest Service to

> have in effect by March 5, 1992, revised standards and guidelines to ensure the northern spotted owl's viability, together with an environmental impact statement, as required by NFMA and its implementing regulations[,]

and enjoining further sales of logging rights in spotted owl habitat areas until that was done. 771 F.Supp. at 1096.

Both orders were affirmed on appeal. 952 F.2d 297 (9th Cir.1991). The court of appeals and district court opinions in *Evans* set out the history and background of the timber/spotted owl controversy, which will not be repeated here.

Pursuant to the May 23, 1991, order in *Evans*, the Forest Service has prepared and issued a new environmental impact statement ("EIS"). On March 3, 1992, defendant James R. Moseley, in his capacity as Assistant Secretary of Agriculture, issued a Record of Decision ("ROD") adopting the Forest Service's preferred alternative from the EIS. The Forest Service then filed a notice of compliance with the May 23 order, and final judgment was entered in *Evans* for plaintiffs Seattle Audubon Society, et al. (SAS"), on the claims under NFMA, and for the Forest Service and Washington Contract Loggers Association, et al. ("WCLA"), on claims asserted under the Migratory Bird Treaty Act.

In the present case, filed March 25, 1992, SAS challenges the legality of the EIS and the ROD, alleging that (1) the EIS fails to assess the environmental consequences to the northern spotted owl of continued logging of its habitat, in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.;* and (2) the management plan adopted does not assure the viability of the owl, does not prescribe mea-

sures to protect critical habitat, and does not assure the viability of other old-growth dependent species, all in violation of NFMA.

As in the *Evans* case, intervenors WCLA support the position of the Forest Service.

All parties have moved for summary judgment, and all agree that summary judgment may properly be entered under Fed.R.Civ.P. 56. The briefs and other written materials submitted, and the arguments of counsel made at a hearing held on May 22, 1992, have been fully considered.

For the reasons stated in this order, the court finds that the Forest Service has not fully complied with NEPA and that it must take further action under that statute. Pending the agency's further compliance with NEPA, no ruling is made on the legality of the proposed management plan.

## II.

### STANDING AND RIPENESS

▇▇▇ The Forest Service argues that SAS lacks standing to challenge the ROD and EIS, and that no controversy is ripe for judicial review. Under existing law, however, standing is clearly established and the case is ripe for decision. *See Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1513–19 (9th Cir.1992).

## III.

### STANDARD OF REVIEW

▇▇▇ The court in reviewing a challenged administrative action determines whether the action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or was taken without observance of procedures required by law. *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 980–81 (9th Cir. 1985); 5 U.S.C. § 706. The standard is narrow and presumes the agency action is valid, *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C.Cir.), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976), but does not shield agency action from a "thorough, probing, in-depth review," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

The focal point for judicial review is the administrative record in existence, not a new record made initially in the reviewing court. *Asarco, Inc. v. EPA,* 616 F.2d 1153, 1159 (9th Cir.1980). The court may, however, consider evidence outside the administrative record for certain limited purposes, e.g., to explain the agency's action or to determine whether its course of inquiry was insufficient or inadequate. *Love v. Thomas,* 858 F.2d 1347, 1356 (9th Cir.1988), *cert. denied,* 490 U.S. 1035, 109 S.Ct. 1932, 104 L.Ed.2d 403 (1989); *Animal Defense Counsel v. Hodel,* 840 F.2d 1432, 1436 (9th Cir.1988).

## IV.

### MOTION TO STRIKE

In addition to citing the administrative record ("AR"), SAS and the Forest Service have filed witness declarations and have cited testimony given at an eight-day evidentiary hearing held in the *Evans* case a year ago. The Forest Service now moves to strike the declarations of Drs. Gordon Orians, Peter Kareiva, Daniel Doak, and Susan Harrison, filed by SAS. It argues that judicial review must be limited to the administrative record. The Forest Service is correct that the scope of review of agency action is narrow. However, materials outside the administrative record may be considered for the limited purposes set out in section III, above. In a NEPA case, the court may consider such materials if necessary to determine whether an EIS has neglected to mention a serious consequence, or failed adequately to discuss a reasonable alternative, or swept problems or criticisms "under the rug." *See Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436–37 (9th Cir.1988). The motion to strike is therefore denied. The rulings on the summary judgment motions would be the same if the declarations were disregarded.

## V.

### MOTIONS FOR SUMMARY JUDGMENT UNDER NEPA

A. *Agency Action since May 23, 1991*

The record shows without dispute that the following has occurred since the May 23, 1991, order in *Evans* was issued:

On September 27, 1991, notice of availability of a draft environmental impact statement ("DEIS") was published in the Federal Register. 56 Fed.Reg. 49182. The DEIS set forth four alternative management plans for the northern spotted owl. Alternative B—adoption of the Interagency Scientific Committee's Report, *A Conservation Strategy for the Northern Spotted Owl* (U.S.D.A., *et al.* 1990) ("ISC Report")—was designated as the Forest Service's preferred alternative.

On January 15, 1992, the United States Fish and Wildlife Service ("FWS") published its critical habitat designation for the owl as a threatened species under ESA. 57 Fed.Reg. 1796. The FWS noted:

Designation of critical habitat does not accomplish the same goals or have as dramatic an effect upon owl conservation as does the ISC Plan, because critical habitat does not apply a management prescription to designated areas, nor does it affect the forest matrix outside of critical habitat (estimated as an additional 12–15 million acres).

57 Fed.Reg. at 1804.

About eighty percent of the critical habitat designated by FWS is in the national forests. The Forest Service, like other agencies, consults with FWS in regard to proposed adverse modifications of habitat for endangered or threatened species. *See* 16 U.S.C. § 1536(a).

Notice of the availability of the final EIS at issue here ("FEIS") was published on January 31, 1992. 57 Fed.Reg. 3753. The FEIS set forth five alternative management plans for the owl, a fifth having been added at the suggestion of a timber industry group. The Forest Service again identified Alternative B, adoption of the ISC Strategy, as its preferred alternative. It rejected Alternatives C and D, which would afford more protection to the owl, and A and E, which would afford less.

On March 3, 1992, defendant Moseley signed the ROD adopting Alternative B as the management plan for northern spotted

owl habitat on the National Forest System lands in Washington, Oregon, and California. *See* ROD; 57 Fed.Reg. 8621 (Mar. 11, 1992).

The ISC Strategy is described in the *Evans* decision, 771 F.Supp. at 1092–93. It calls for habitat conservation areas ("HCAs"), spacing requirements, and the "50–11–40" rule. As noted in *Evans*, the ISC Report "has been described by experts on both sides as the first scientifically respectable proposal regarding spotted owl conservation to come out of the executive branch"; however, it had "not been put to the test of public comment and hearings" and "may or may not prove to be adequate." *Id.* at 1093.

The ISC found that the owl was "imperiled over significant portions of its range because of continuing losses of habitat from logging and natural disturbances," and that "available alternatives are steadily declining throughout the bird's range." ISC Report at 1. One feature, in particular, of the ISC Strategy has been questioned by qualified experts. The strategy would permit further, near-term loss of owl habitat in return for later recruitment of new habitat within HCAs. Although the plan predicts "a high probability of success over the next 100 years," ISC Report at 378, it envisions a net decrease of approximately 468,000 acres of spotted owl nesting, roosting, and foraging habitat over the next fifty years. *See* ISC Report at 4; FEIS at 3 & 4–57, 97. The ISC acknowledges that in "a worst-case scenario, we estimate that the strategy could result in a 50 to 60% reduction in current owl numbers." ISC Report at 34.

The expectation of long-term success despite near-term destruction of spotted owl habitat and potential loss of more than half the remaining owls is based on an

> implied assumption ... that the owl population will reach a new, stable equilibrium at some future time. We are confident in this assumption, even though the amount of suitable habitat and the number of owls will continue to decline over the short term. We hypothesize that once the rate of loss of suitable habitat

outside HCAs comes into balance with the rate new habitat is recruited within the HCAs, a stable equilibrium will be attained. This equilibrium will, of course, be at a lower population number than existed historically. Further, because the spotted owl has a low reproductive potential, considerable time may be required for the population to stabilize at a new equilibrium number.

ISC Report at 35.

A chief concern of scientists of all persuasions has been whether the owl can survive the near-term loss of another half-million acres of its habitat.

## B. *NEPA Requirements*

The requirements of NEPA apply to the agency action in question here. *See* 16 U.S.C. § 1604(g)(1); 36 C.F.R. § 219.8(c).

SAS alleges, in its fourth claim for relief, that the Forest Service has violated NEPA because the FEIS:

> a. fails to disclose all of the known and likely environmental consequences to the northern spotted owl of logging owl habitat as proposed by the ROD;
>
> b. fails to acknowledge or assess the fundamental scientific uncertainty of the FEIS' predicted environmental consequences on the spotted owl;
>
> c. fails to acknowledge or respond to the body of responsible scientific opinion that contradicts the FEIS' conclusions;
>
> d. fails to disclose the absence of any actual monitoring program to assess the effects of the proposed action on the owl; and
>
> e. fails to assess the effects on the Forest Service action of the failure of other agencies to adopt adequate long-term owl conservation plans.

Complaint for Declaratory and Injunctive Relief at 14–15 (Mar. 25, 1992) (Dkt. # 1).

■ In deciding the cross-motions for summary judgment on this claim, the court is governed by the standard of review set forth above and by the requirements of NEPA. "An agency must candidly disclose in its EIS the risks posed by its proposed action. Otherwise the EIS cannot serve its

purpose of informing the decisionmaker and the public *before* the decision to proceed is made." *Friends of the Earth ("FOE") v. Hall*, 693 F.Supp. 904, 937 (W.D.Wash.1988) (emphasis in original). An EIS must also inform the decisionmaker of the full range of responsible opinion on environmental effects. *Citizens Against Toxic Sprays, Inc. v. Bergland*, 428 F.Supp. 908, 922 (D.Or.1977). An EIS that fails to disclose and respond to "the opinions held by well respected scientists concerning the hazards of the proposed action . . . is fatally deficient." *FOE v. Hall*, 693 F.Supp. at 934. This does not mean that the court must decide whether the statement is based on the best scientific methodology available, or resolve disagreements among experts. *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir.1985). Rather, the court's task is

> to ensure that the procedure followed [by the agency] resulted in a reasoned analysis of the evidence before it, and that the [agency] made the evidence available to all concerned.

*Id.* As the First Circuit has held:

> [T]he requirement of a detailed statement helps insure the integrity of the process of decision by precluding stubborn problems or serious criticism from being swept under the rug. A conclusory statement unsupported by empirical or experimental data, scientific authorities, or explanatory information of any kind not only fails to crystallize issues, but affords no basis for a comparison of the problems involved with the proposed project and the difficulties involved in the alternatives.

*Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir.1973) (citation and quotations omitted).

C. *Risks and Criticisms Not Addressed in the FEIS*

Even when the record is viewed in the light most favorable to the Forest Service, it is clear that the agency has failed to address in the FEIS and ROD the risks and criticisms numbered 1 and 2, below, and accordingly has failed to consider them *in combination.* It has also not explained how the predicted consequence described in

paragraph 3, below, can or should be accepted. The declaration of Dr. Jack Ward Thomas, team leader of the ISC, filed by the Forest Service, describes how the ISC did its work in 1989–90 but does not speak to the matters discussed in this section.

1. BLM Timber Sales Designated by the Fish and Wildlife Service as Jeopardizing the Spotted Owl

■ The ISC Strategy depends on the cooperation of other federal agencies that manage spotted owl habitat.

The ISC stated:

> We believe that the current situation— that is, the lack of a well-coordinated, biologically based management plan, applied consistently throughout the range of the spotted owls—is unacceptable and contributes to a high risk that spotted owls will be extirpated from significant portions of their range.

ISC Report at 97.

It also said:

> We believe that the weakest link is apt to be inadequate coordination between concerned agencies resulting from various efforts to protect management prerogatives and entrenched ways of doing business.

ISC Report at 43.

The ISC Strategy was designed two years ago. To have a chance of success, it would have to be adopted and followed by agencies other than the Forest Service, including the BLM, that manage forests containing owl habitat. 771 F.Supp. at 1092. That is what the ISC intended. *See* ISC Report at 3, 27, 29, 42.

The BLM, however, declined to adopt the ISC Strategy in full. It proposed a lower level of protection in the "Jamison Strategy," but this was found inadequate by FWS. *Lane County Audubon Soc'y v. Jamison*, 958 F.2d 290, 293 (9th Cir.1992).

Recognizing that the BLM has not committed itself to the ISC Strategy, the FEIS makes the following assumption:

> The above viability ratings assume other Federal Agencies will manage their land with a level of owl protection similar

to the ISC Strategy, through consultation with the U.S. Fish and Wildlife Service under Section 7(a) of the Endangered Species Act. Participation by the Bureau of Land Management is necessary to provide for high population viability under Alternatives B, C, and D.

FEIS at Summary–18.

The FEIS warns that if the Endangered Species Committee permits Bureau of Land Management ("BLM") timber sales that have been identified by FWS as jeopardizing the owl as a threatened species, the Forest Service's viability analysis will have to be re-evaluated. This is stated three times, as follows:

As a result of receiving "jeopardy opinions" on 44 proposed timber sales, the Bureau of Land Management applied on September 11, 1991 for an exemption from the requirements of the Endangered Species Act under Section 7(g). If the Endangered Species Committee grants an exemption to the BLM, and spotted owl habitat on the lands BLM manages is adversely modified, *this viability rating would be optimistically high at least for southwest Oregon and the Oregon Coast Range populations.*

FEIS at 3 & 4–51 (emphasis added).

If the Endangered Species were to grant BLM an exemption from requirements of the Endangered Species Act, Section 7(a), *this viability assessment would need to be reconsidered.*

FEIS at 3 & 4–94 (emphasis added).

Should the Endangered Species Committee grant an exemption to the Bureau of Land Management and the spotted owl habitat on the lands it manages is adversely modified, this new information *would be a cause for reexamining the effects on the viability of the spotted owl* as a subspecies and reexamining the management direction for its habitat on the National Forests.

FEIS at L–A–2 (emphasis added).

On May 14, 1992, the Endangered Species Committee, at the request of the BLM, did what the FEIS had warned against. It decided that thirteen BLM timber sales in Oregon, designated by FWS as "likely to jeopardize the continued existence of the spotted owl" would nevertheless go forward. *See* Beuter Declaration at 3, ¶ 5 (May 21, 1992) (Dkt. # 135).

By the terms of the FEIS itself, the approval of these sales designated by FWS as jeopardizing the owl's survival prospects necessitates a re-evaluation of the ISC Strategy. The EIS team has not yet done this. Dr. John Beuter, Acting Assistant Secretary of Agriculture for Natural Resources and Environment, states in a declaration dated May 21, 1992:

Because the FEIS and ROD noted that an exemption of the BLM timber sales would require reconsideration of the viability assessment of the selected alternative, Alternative B, I directed the Forest Service to contact the EIS team to consider the effect of the ESC decision on the viability assessment. I was notified that it would take four to eight weeks to get the team together and report back to me.

Beuter Declaration at 3, ¶ 6.

Dr. Beuter's own opinion that the ISC Strategy would still be valid cannot take the place of the scientific analysis that is required.

The very event that the FEIS states would demand a re-evaluation of the viability analysis upon which Alternative B depends has occurred. That being so, there is no choice but to remand the matter to the agency.

2. Anderson and Burnham Report

Since the ISC Strategy was devised two years ago, Drs. Anderson and Burnham of the U.S. Fish and Wildlife Service have done a thorough assessment of spotted owl demography. In July 1991 Dr. Anderson was asked by the Northern Spotted Owl Recovery Team of FWS to prepare a comprehensive analysis of the capture-recapture data on the owl. Six biologists and six data analysts prepared an objective analysis of the population data available. The Forest Service received a draft copy of their report in October or early November 1991.

Testifying on January 28, 1992, before the Endangered Species Committee regarding the BLM's request for an exemption from ESA, Dr. Anderson summarized the results:

1. Populations of resident, territorial female owls in all five study areas have declined significantly at an estimated average rate of 7.5% per year during the 1985–91 period.

2. The parameter most important in λ is the annual survival probability of adult females and this parameter has decreased significantly during the 1985–91 period.

3. The rate of this population decline has probably accelerated due to the significant decrease in the probability of survival of adult females.

I must conclude that this is a very critical time for the norther [sic] spotted owl population. *Management plans (or "Conservation Strategies") for the northern spotted owl, such as the Interagency Scientific Committee (ISC), were made nearly two years ago and without the benefit of the current, scientific findings* (i.e., Appendix C of the draft Recovery Plan). First, while it was known to the ISC that populations were declining, few realized the rate of decline might be as high as 7.5% per year. Second, at the time the ISC was preparing the Conservation Strategy, perhaps no one realized that the rate of decline was accelerating and the implications of this to the owl population and the management plans.

*Substantial and accelerating rates of population decline raise serious questions about the adequacy of the ISC Conservation Strategy and the current Consultation Process.* The very high degree of fragmentation of the remaining habitat may be the most likely cause of the declining populations. It seems questionable if further harvest of remaining suitable habitat is possible without risking, at least, local extinctions.

AR 561 at 4–5 (emphasis added).

Dr. Barry Noon of the Forest Service, an expert in population dynamics and a member of the ISC team, has described the Anderson and Burnham report as a "very credible document" which "goes beyond what we were able to do in the ISC." AR 894 at 3603–04. Dr. Noon testified as follows before the Endangered Species Committee in January 1992:

Q. Now, your opinions that you expressed yesterday, could that be characterized essentially, that *timber harvesting right now has to be arrested in order for the spotted owl to be saved from extinction?*

A. *That's correct.*

Q. And that's timber harvesting everywhere?

A. Well, within the range of the subspecies. It certainly varies by geographic location, because the magnitude of the impact of timber harvest is not uniform across the range of the subspecies.

AR 894 at 3648–49 (emphasis added).

Dr. Kathy O'Halloran, the wildlife biologist on the owl EIS team, wrote an internal "Reassessment of the Viability Rating" on February 1, 1992, as follows:

Based on information presented at the Endangered Species Committee hearings in Barry Noon's and David Anderson's testimony, there is new information that has come to light since the ISC.

Populations of spotted owls are decreasing in 5 demographic study areas, and the rates of decline are accelerating. It is the precipitous rate of decline on BLM land and the indication that the rate is accelerating that is most alarming. (ISC contained information on 2 demographic study areas that showed a population decline, but information was not available to estimate rates of decline).

Densities of owls are also decreasing.

The amount of suitable owl habitat in HCAs on BLM land is less than was the amounts used in preparation of the ISC Report.

The shape of the HCAs has now been demonstrated through the modeling efforts of McKelvey and Noon to be more important than previously believed. This

is of especial importance in the checkerboard ownership areas.

All factors indicate that there may be an increased cause for concern for the owl in these areas. Therefore, this brings into question the viability rating for the EIS on the ISC strategy. *It is likely that there would be a change from a rangewide rating of high likelihood of providing for a viable population to a lower level of certainty for the ISC strategy based on the new information on BLM lands.*

AR 250 at 1 (emphasis added).

Although Dr. O'Halloran listed reconvening the ISC as a possible choice of action, that was not done.

 The Forest Service asserts, chiefly through the declaration of Dr. Eric Forsman, that the Anderson and Burnham report was considered and was not deemed to require a change in the ISC Strategy. Dr. Forsman states that the report should not be given undue weight and that some of the data are contradictory; however, he also says that all of the expert researchers who contributed to the report are "alarmed," and that the contention of SAS's experts that the owl is at or near a fatal population threshold "may or may not be true." Forsman Declaration at 5, 6 (May 15, 1992) (Dkt. # 111). Dr. Forsman recommends proceeding under the ISC plan and monitoring the results but does not make clear how the situation could be rectified if the critics are correct.

The agency's explanation is insufficient under NEPA—not because experts disagree, but because the FEIS lacks reasoned discussion of major scientific objections. The FEIS does not say why the Anderson and Burnham report falls short of requiring a change. It states only:

Initial analysis of data from five spotted owl demographic study areas in Washington, Oregon and northern California indicate that populations are declining in all five study areas (Forsman Pers. comm.).

After a preliminary review of new studies, the demographic parameter values used in the ISC Report for determining spotted owl population status and trends have not changed significantly (Forsman Pers. comm.; 56 FR 40010).

FEIS at 3 & 4–35.

The ROD's treatment of the study later, after the testimony of Drs. Anderson and Noon and Dr. O'Halloran's memorandum, is nearly as cursory. ROD at 17.

 NEPA requires that the agency candidly disclose in its EIS the risks of its proposed action, and that it respond to adverse opinions held by respected scientists. *FOE v. Hall,* 693 F.Supp. at 934, 937. The agency may not rely on conclusory statements unsupported by data, authorities, or explanatory information. *Silva,* 482 F.2d at 1285. The statute also requires a reasoned decision whether to supplement an EIS if new information becomes available:

A federal agency has a continuing duty to gather and evaluate new information relevant to the environmental impact of its actions, even after release of an EIS. *Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017, 1023–24 (9th Cir.1980) (*Warm Springs Dam II*)....

An agency's decision not to supplement an EIS will be upheld if it was reasonable. *Warm Springs Dam II,* 621 F.2d at 1024. When new information comes to light the agency must consider it, evaluate it, and make a reasoned determination whether it is of such significance as to require implementation of formal NEPA filing requirements. *Id.* Reasonableness depends on the environmental significance of the new information, the probable accruacy [sic] of the information, the degree of care with which the agency considered the information and evaluated its impact, and the degree to which the agency supported its decision not to supplement with a statement of explanation or additional data. *Id.*

*Stop H–3 Ass'n v. Dole,* 740 F.2d 1442, 1463–64 (9th Cir.1984). The Anderson and Burnham report is important enough that highly qualified experts, including some in the employ of the Forest Service, believe it

means the ISC Strategy must be revised. This being so, the agency cannot merely say that the report and the criticisms arising from it make no difference; to comply with NEPA, it must give a reasoned analysis and response.

### 3. Low Viability Ratings for Other Species

The governing regulation requires the Forest Service to manage these public lands so as "to maintain viable populations of existing native and desired non-native species in the planning area." 36 C.F.R. § 219.19. As stated in the March 7, 1991, order in *Evans,* this duty "requires planning for the entire biological community—not for one species alone." Order on Motions for Summary Judgment at 12, No. C89–160WD (March 7, 1991) (Dkt. # 824); *see also Seattle Audubon Soc'y v. Evans,* 952 F.2d 297, 301 (9th Cir.1991).

Since not every species can be monitored, "indicator species" are observed as signs of general wildlife viability. 36 C.F.R. § 219.-19(a)(1).

 NFMA and its implementing regulations plainly do not allow the agency to plan the extermination of native vertebrate species. Yet, in a section headed "Environmental Consequences for Wildlife Associated with Late–Successional Forests," the FEIS states at 3 & 4–140:

> The Scientific Panel on Late–Successional Forest Ecosystems rated Alternative B in this environmental impact statement as having a low to medium-low probability of providing for viable populations of late-successional forest associated wildlife species other than northern spotted owls.

While the quoted passage does not identify the species that would have "low to medium-low" prospects under Alternative B, the FEIS elsewhere lists thirty-two "late-successional forest associated wildlife species." FEIS at 3 & 4–136 (Table 3 & 4–30). Alternative management plans C and D, both rejected by the agency, would afford more protection to these species. FEIS at 3 & 4–140.

The FEIS has thus mentioned what appears to be a major consequence of the plan—jeopardy to other species that live in the old growth forests—without explaining the magnitude of the risk or attempting to justify a potential abandonment of conservation duties imposed by law. An EIS devoid of this information does not meet the requirements of NEPA. *See, e.g., Foe v. Hall,* 693 F.Supp. at 934, 937.

### D. SAS's Argument as to "Critical Habitat" Designated by FWS

The NFMA regulations provide that the "minimum specific management requirements" shall "[i]nclude measures for preventing the destruction or adverse modification of critical habitat for threatened and endangered species." 36 C.F.R. § 219.-27(a)(8); *see also* § 219.19(a)(7). The FEIS in this regard provides that

> [t]he appropriateness of a proposed action in Critical Habitat will be determined through consultation with the U.S. Fish and Wildlife Service according to Section 7(a) of the Endangered Species Act[.]

FEIS at 2–3.

SAS contends that this is not enough—that the Forest Service is bound not only to observe the ESA consultation process, but to promulgate regulations of its own assuring that critical habitat will not be destroyed or adversely modified.

 The Forest Service's position on this issue is correct. A "critical habitat" designation by the FWS does not in itself invoke any management program; instead, it requires consultation to ensure that an action of a federal agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [the species' critical] habitat." 16 U.S.C. § 1536(a)(2). Logging may be allowed under ESA if consistent with that goal.

 Part, but not all, of the FWS-designated critical habitat for the spotted owl is in the national forests. To read the NFMA regulations as barring the Forest Service from making *any* adverse modifica-

tion of that area would go beyond their intent and purpose. In the interaction between the two agencies, the Forest Service satisfies its duty under §§ 219.27(a)(8) and 219.19(a)(7) if it and the FWS comply fully with the consultation requirements of 16 U.S.C. § 1536(a).

### E. Conclusion as to NEPA

For the reasons stated in section V–C, above, the FEIS and ROD do not meet the requirements of NEPA. To that extent, SAS's motion for summary judgment is granted, and the summary judgment motions of the Forest Service and WCLA are denied.

### VI.

### MOTIONS UNDER NFMA

Pending further compliance by the Forest Service with NEPA, and the changes that may follow, there is no need to decide the cross-motions for summary judgment under NFMA, which raise the issue whether the agency has arbitrarily and capriciously adopted a plan which, based on present knowledge, would be unlikely to maintain a viable population of owls or other species. Those motions are therefore stricken without prejudice.

### VII.

### SCHEDULING CONFERENCE

The parties have stipulated that a separate hearing as to the scope of relief should be held once this order is issued. A conference will be held in open court at 10:00 a.m. on May 29, 1992, to set a schedule for that purpose. Any counsel wishing to take part by telephone may do so provided arrangements are made in advance with the law clerk assigned to this case. Ruling on SAS's motion for a preliminary injunction is deferred pending that conference.