**PUBLIC LANDS COUNCIL, a non-profit membership organization on behalf of its members; National Cattlemen's Association, a non-profit membership organization on behalf of its members; American Sheep Industry Association, a non-profit membership organization on behalf of its members; American Farm Bureau Federation, a non-profit membership organization on behalf of its members; Association of National Grasslands, a non-profit membership organization on behalf of its members, Petitioners,**

v.

**UNITED STATES DEPARTMENT OF the INTERIOR SECRETARY, a/k/a Bruce Babbitt, in his official capacity; Acting Director, U.S. Bureau of Land Management, a/k/a Michael Dombeck, in his official capacity; Department of Interior; Bureau of Land Management, Respondents.**

No. 95–CV–165–B.

United States District Court,
D. Wyoming.

June 12, 1996.

Constance E. Brooks, Denver, CO, Michael B. Marinovich, Denver, CO, Calvin E. Ragsdale, Green River, WY, argued, Paul R. Frischknecht, Manti, UT, William J. Thomas, Sacramento, CA, William Gerry Myers III, Washington, DC, of counsel, for petitioners.

John W. Watts and Gary B. Randall, argued, U.S. Department of Justice, Environment and Natural Resources Division, Washington, DC, L. Robert Murray, Asst. U.S. Attorney (WY), Cheyenne, WY, Laura B. Brown, Office of the Solicitor, U.S. Department of the Interior, Washington, DC, Mark Stiles, for respondents.

## ORDER ON PETITION FOR REVIEW

BRIMMER, District Judge.

In February, 1995, the Secretary of the Interior, Bruce Babbitt, promulgated new regulations governing the administration of livestock grazing on public lands managed by the Bureau of Land Management ("1995 regulations"). The regulations became effective on August 21, 1995.

The petitioners challenge these new regulations, claiming that portions of the regulations violate the Taylor Grazing Act, the Federal Land Policy Management Act, the

Public Rangelands Improvement Act, the National Environmental Policy Act, and the Administrative Procedure Act (APA). The petitioners also claim that the regulations deny them due process and subject them to double jeopardy, and otherwise lack a rational basis. The petitioners ask the Court to declare several of the 1995 regulations unlawful and enjoin their implementation.

### Standard of Review

■ A district court sits as an appellate court when reviewing agency action. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir.1995). Under the APA, this Court must uphold agency action unless it is arbitrary and capricious, exceeds statutory authority, or violates the Constitution. 5 U.S.C. § 706(2); *see also Mountain Side Mobile Estates v. Secretary of HUD*, 56 F.3d 1243, 1250 (10th Cir.1995).

■ Agency action is arbitrary and capricious if there is no rational basis for the action or if the agency fails to consider important relevant factors. *Woods Petroleum Corp. v. Department of Interior*, 47 F.3d 1032, 1037 (10th Cir.1995). Public Lands Council bears the burden of proving that the Department of Interior acted arbitrarily and capriciously, exceeded its statutory authority, or violated the Constitution.

### Analysis

**I. Elimination of the Grazing Preference**

The 1995 regulations replace the term "grazing preference" with the term "permitted use." Public Lands Council argues that this eliminates the grazing preference and thus violates the Taylor Grazing Act. The government disagrees and argues that the change in terminology is a change in form, not substance, and the new rules do not eliminate or interfere with anything in the Taylor Grazing Act.

Congress enacted the Taylor Grazing Act in 1934. Pursuant to the Act, the Secretary identified public lands "chiefly valuable for grazing and raising forage crops" and placed these lands in grazing districts. 43 U.S.C. § 315. After designating these districts, the Secretary began issuing permits pursuant to the Taylor Grazing Act, which provides:

> The Secretary of the Interior is hereby authorized to issue or cause to be issued permits to graze livestock on such grazing districts to such bona fide settlers, residents, and other stock owners as under his rules and regulations are entitled to participate in the use of the range.... Preference shall be given in the issuance of grazing permits to those within or near a district who are landowners engaged in the livestock business, bona fide occupants or settlers, or owners of water or water rights.

43 U.S.C. § 315b.

Thus, the Department of Interior engaged in a lengthy adjudication process to determine who was eligible for a grazing preference. This process began in the 1930's and took nearly 20 years to complete. Applicants were divided into five classifications with different priorities assigned to each class of applicants. The Department of Interior reviewed applications and recommendations of local boards, and issued adjudication decisions awarding grazing preferences to qualified applicants. The term "grazing preference" thus came to represent an adjudicated right to place livestock on public lands. This right was measured in Animal Unit Months (AUMs), the amount of forage necessary to sustain one animal for one month.

The grazing preference attached to the base property, and followed the base property if it was transferred. The adjudication process provided predictability and security to livestock operators who remained in one area. This system comported with congressional intent, which was to provide stock operators with "some type of assurance as to where and what kind of range they may have and depend upon for their stock, what they can definitely rely upon in the way of pasturage." 78 Congressional Record at 5371.

■ Once the Department of Interior granted a grazing preference, the Taylor

Grazing Act required that "grazing privileges recognized and acknowledged shall be adequately safeguarded." 43 U.S.C. § 315b. This language imposes on the Secretary an affirmative duty to protect grazing privileges. *Oman v. United States,* 179 F.2d 738, 742 (10th Cir.1949).

 Despite this safeguarding requirement—which protects long-established grazing preferences—the 1995 regulations eliminate the adjudicated grazing preferences. They do so by using the term "permitted use" which is defined as "the forage allocated by, or under the guidance of, an applicable land use plan for livestock grazing in an allotment under a permit or lease and is expressed in AUMs." 43 C.F.R. § 4100.0–5 (1995). The term "permitted use" has no connection to the painstakingly adjudicated "grazing preferences." Under the 1995 regulations, a permittee no longer has an adjudicated right to graze a predictable number of livestock on public lands.

A "permitted use" does not enjoy the same protection that an adjudicated "grazing preference" received. A "grazing preference" could not be canceled, suspended, or reduced without an evidentiary hearing that afforded due process to the permittee. 43 U.S.C. § 315h; *Oman,* 179 F.2d at 742. The Secretary's substitution of a right of renewal provides less protection and violates the Taylor Grazing Act because it fails to adequately safeguard the recognized grazing preferences.

The change also reduces predictability and certainty. Bank loans are often based on carrying capacity. A permittee without a definite and certain grazing preference may be unable to obtain necessary financing and be forced out of the livestock industry. *See* 78 Cong.Rec. at 5371.

Although the Taylor Grazing Act gives the Secretary the power to do "any and all things necessary" to protect the rangeland, 43 U.S.C. § 315a, this general grant of authority is not so broad that it allows the Secretary to violate the Act's specific mandate to adequately safeguard grazing preferences.

The Secretary's expressed desire to make grazing regulations similar to Forest Service rules is not a reasoned explanation. The Taylor Grazing Act does not apply to national forests, and the Forest Service did not engage in a lengthy adjudication process to establish grazing preferences.

Additionally, grazing permits issued by the Forest Service enjoy much less protection that a Taylor Grazing Act grazing preference. The Forest Service has broad discretion to deny or refuse to renew permits and is not required to provide a permittee or applicant with notice and a hearing. In contrast, the Taylor Grazing Act requires the Secretary to safeguard grazing preferences and provides for notice and a hearing.

With a mere stroke of his pen, the Secretary has boldly and blithely wrested away from Western ranchers the very certainty, the definitiveness of range rights, and the necessary security of preference rights that their livestock operations require. Congress gave Western ranchers these rights by enacting the Taylor Grazing Act, and many decades of satisfactory operations and the course of case by case adjudications have confirmed these rights. The Court cannot ignore the Secretary's disregard of his congressionally imposed duty; it must be stopped before it wreaks havoc with the ranching industry that Congress has tried to preserve.

For these reasons, the Court holds that the 1995 regulations violate the Taylor Grazing Act by failing to adequately safeguard adjudicated grazing preferences and that the 1995 regulations lack a reasoned basis. The Court therefore concludes that the Secretary exceeded his statutory authority by enacting this regulation.

## II. Affiliate Regulations

Before a permittee can renew his grazing permit, the Department of Interior must determine that the applicant, and any affiliate(s) of the applicant, have substantially complied with the terms and conditions of

the original permit. 43 C.F.R. § 4110.1–1(b)(1) (1995). An applicant seeking a new permit will not receive it if the applicant or any affiliate of the applicant has had a grazing permit or lease cancelled in the preceding 36 months for violating that permit's terms and conditions. *Id.* at (b)(2). The 1995 regulations define an affiliate as:

> [A]n entity or person that controls, is controlled by, or is under common control with, an applicant, permittee, or lessee. The term "control" means having any relationship which gives an entity or person authority directly or indirectly to determine the manner in which an applicant, permittee or lessee conducts grazing operations.

43 C.F.R. § 4100.0–5 (1995).

The Secretary's definition of "affiliate" is extremely broad, but no more so than the definition of "affiliate" in other federal statutes. *See, e.g.,* 11 U.S.C. § 101(2) (bankruptcy code definition); 36 C.F.R. § 223.133 (1995) (Forest Service definition). More importantly, the Taylor Grazing Act gives the Secretary broad authority to do "any and all things necessary" to preserve the public lands and "to provide for the orderly use, improvement, and development of the range." 43 U.S.C. § 315a. The Taylor Grazing Act also gives the Secretary authority to determine "which individuals under his rules and regulations are entitled to participate in the use of the range." 43 U.S.C. § 315b.

■ The new "affiliate" provision certainly falls within the broad scope of power the Taylor Grazing Act confers on the Secretary. The Secretary is charged with preserving the public lands and ensuring that those who use the public lands have complied with the terms and conditions of earlier permits. It follows, then, that the Secretary should consider the stewardship records of permit holders and their affiliates. It would be illogical to consider a permittee in compliance with the permit's terms and conditions when the permittee's agents or employees to violate these very terms and conditions when carrying out the permittee's business.

Given this fact, and the Secretary's broad powers under the Taylor Grazing Act, the Court finds that these regulations are rational and do not exceed the Secretary's broad rulemaking power.

### III. Title to Range Improvements

Before 1995, the Department of Interior encouraged private investment in public lands by allowing private individuals, through cooperative agreements with the Department of Interior, to build and install structural range improvements (like fences, wells, stock tanks, and pipelines) on public lands. Title to such improvements was "shared by the United States and the cooperator(s) in proportion to the actual amount of respective contribution to the initial construction." 43 C.F.R. § 4120.3–2 (1994). In fact, the Department of Interior often required permittees to build such improvements as a condition for issuing a grazing permit.

■ The 1995 regulations alter this practice and provide that the United States asserts title to all structural range improvements authorized after August 21, 1995. 43 C.F.R. § 4120.3–2(b) (1995). The purpose of this change is to "return to common law concepts regarding retention of permanent improvements in the name of the party that holds title to the land." 60 Fed.Reg. 9897. Public Lands Council argues that this change contradicts the Taylor Grazing Act and further claims that the Department of Interior failed to provide a reasoned explanation for making the change. The Court agrees with this argument and holds that the regulation exceeds statutory authority and lacks a reasoned basis.

The Taylor Grazing Act allows permittees to construct range improvements on public lands. 43 U.S.C. § 315c. If a permittee receives a grazing permit to use land where a prior occupant has constructed a range improvement, the new permittee cannot use the improvement unless he compensates the prior occupant for the reasonable value of the improvement. *Id.* This compensation provision strongly suggests that the individual

who constructed the improvement should own it. The 1934 Senate Committee Hearings support this conclusion. *See* 1934 Senate Committee Hearings at 77–80.

Additionally, the Federal Land Policy Management Act also indicates that this was Congress' intent. The Federal Land Policy Management Act provides that if the Secretary cancels a grazing permit or lease to devote the land to another public purpose, the United States must compensate the permittee or lessee for the value of his interest in any range improvements. 43 U.S.C. § 1752(g). Such compensation would not be necessary if the permittee did not own the range improvement.

■ The Department of Interior's expressed desire to return to common law precepts about ownership is not a reasonable one. The Taylor Grazing Act and the Federal Land Policy Management Act clearly indicate that Congress intended to grant title to range improvements to those who constructed them. A federal statute preempts the common law.

Even if the common law applied, however, the Department of Interior's explanation would not be reasonable. Range improvements would not be considered fixtures because the range improvements usually could be severed from the land without adversely affecting the land, except for reservoirs and similar improvements. Therefore the permittee or lessee would still hold title to the improvements.

The Department of Interior also claims that the new regulation is necessary to facilitate the multiple use of public lands in accordance with the Federal Land Policy Management Act. However, the old regulations required that all range improvements had to be "consistent with multiple use management." 43 C.F.R. § 4120.3–1(a) (1994). The new regulation does not facilitate multiple use management; such management was already the rule.

For these reasons, the Court holds that the 1995 regulation regarding title to range improvements contradicts the Taylor Grazing Act and discourages private investment in public lands and rangeland improvements. The Secretary seeks to confiscate the improvements the ranching industry makes to increase the carrying capacity of the range. This regulation exceeds statutory authority and lacks a reasoned basis.

## IV. Conservation Use Permits

The 1995 regulations alter the definition of "active use" to include "conservation use" as an active use. 43 C.F.R. § 4100.0–5 (1995). Conservation use is an activity, excluding livestock grazing, designed to protect public land, improve rangeland conditions, or enhance resource values. *Id.* A permittee may engage in conservation use for a defined period up to 10 years. A permittee who receives a permit for conservation use thus receives a grazing permit to not graze livestock. Public Lands Council argues that this new "active" use exceeds statutory authority and contradicts congressional intent. The Court agrees.

■ The Taylor Grazing Act is, as its name indicates, a grazing act. Pursuant to the Taylor Grazing Act's mandate the Secretary identified public lands best suited for grazing and placed these lands in grazing districts. The Taylor Grazing Act authorizes the Secretary to issue permits to graze these lands, but it does not authorize the Secretary to issue permits allowing permittees to remove public lands from grazing for ten-year periods. Congress enacted the Taylor Grazing Act to provide certainty and predictability in the livestock industry; issuing permits that excludes livestock grazing from public lands frustrates this goal. Such permits also circumvent the decision Congress made when enacting the Taylor Grazing Act that certain lands were best suited for grazing.

Conservation use permits also violate the Federal Land Policy Management Act. The Federal Land Policy Management Act defines livestock grazing as a "principal or major use." 43 U.S.C. § 1702(1). The Department of Interior must use the Federal Land

Policy Management Act's land use planning process before it excludes a major use like livestock grazing from public lands. 43 U.S.C. § 1712. The Department of Interior must amend Bureau of Land Management land use plans before withdrawing public lands from livestock grazing, and it must also notify appropriate congressional committees if more than 100,000 acres are involved. *Id.* The Federal Land Policy Management Act requires the Department of Interior to provide the public with notice of its intent to close public lands to livestock grazing and give the public an opportunity to comment on the plan. 43 U.S.C. § 1739.

The Taylor Grazing Act does not permit the Secretary to issue permits allowing the permittee to put the land to any use except livestock grazing. Such permits contradict the very purpose of the Taylor Grazing Act; therefore, the Secretary exceeded his statutory authority by enacting this provision of the 1995 regulations.

### V. Limits on Temporary Non–Use

The 1995 regulations allow the Bureau of Land Management to authorize temporary non-use of a grazing permit. 43 C.F.R. § 4130.2(g). Reasons justifying temporary non-use of a grazing permit include financial hardship and annual livestock fluctuation. The regulation limits temporary non-use to three consecutive years. *Id.* at (g)(2). Earlier regulations also allowed temporary non-use, but did not impose a time limitation. Public Lands Council argues that the three-year limit lacks a rational basis and forces permittees to use their permit or lose it, even if temporary non-use would benefit the land.

The record reveals that the Department of Interior had a rational basis for implementing this regulation. A 1986 study by the Interior Department Inspector General determined that a significant number of permittees abused the temporary non-use option by placing their allotted AUMs in temporary non-use for periods of four to five years (or even longer, in some cases) without providing an acceptable reason for doing so. As a result, available AUMs went unused and cost the Bureau of Land Management potential revenue. The Inspector General's "conservative estimate" of this lost revenue was $1,000,000 for the 1984 grazing season.

The Inspector General criticized the Bureau of Land Management's supervision of the temporary non-use option and recommended that the Bureau of Land Management police temporary non-use more closely. After reviewing the Inspector General's study and criticism, the Bureau of Land Management imposed a three-year limit on temporary non-use.

Public Lands Council claims that the three-year limit does not account for the possibility that prolonged, severe weather conditions might require temporary non-use that exceeds three years. Although the Court agrees that this limit might be bad judgment, it cannot say that the Secretary's judgment was arbitrary and capricious. The Court cannot set the three-year limit aside.

### VI. Reduction of Mandatory Qualifications

Before 1995, applicants had to "be engaged in the livestock business" and own or control land or water base property to qualify for a grazing permit. 43 C.F.R. § 4110.1 (1994). The regulations also required that an applicant be either: (1) a U.S. citizen (or have filed a declaration of intent to become a U.S. citizen; or (2) a group or association authorized to do business in the state in which the grazing permit was sought. All members of the group or association had to be U.S. citizens or have declared their intent to become U.S. citizens; or (3) a corporation authorized to do business in the state in which the grazing permit was sought. *Id.*

The 1995 regulations retain all of these requirements except for one—the applicant need not be engaged in the livestock business. Instead, the applicant need only own or control base property that is capable of being used in the livestock business. 43 C.F.R. §§ 4110.1, 4110.2–1(a)(1) (1995).

Public Lands Council claims that this change violates the Taylor Grazing Act and lacks a reasoned basis.

The Taylor Grazing Act provides that "[p]reference shall be given in the issuance of grazing permits to those within or near a district who are landowners engaged in the livestock business, bona fide occupants or settlers, or owners of water or water rights." 43 U.S.C. § 315b. Congress intended for the Taylor Grazing Act to benefit people actually engaged in the livestock business. 1934 Senate Committee Hearings at 74. From the beginning the Department of Interior consistently granted grazing permits and leases only to applicants engaged in the livestock business. *See, e.g., Winchester Land and Cattle Co.*, 65 Interior Dec. 148 (1958); *Orin L. Patterson, et al.*, 56 Interior Dec. 380 (1938) (denying application for grazing lease because applicant was not engaged in the livestock business).

■ Allowing individuals who own or control land suitable for livestock use, but who do not actually raise livestock, to obtain grazing permits frustrates congressional intent. These individuals should not be able to obtain grazing permits they cannot use and thereby preclude livestock operators from grazing their livestock on public lands.

The Department of Interior claims that this change is necessary because it allows non-traditional applicants like banks and conservation organizations to obtain grazing permits. However, such applicants were already able to obtain grazing permits. *See, e.g., Forgey Ranch Co. v. Bureau of Land Management*, 116 IBLA 32 (1990) (allowing bank to keep permit because it was engaged in the livestock business); *Defenders of Wildlife*, 19 IBLA 219 (1975) (conservation organization engaged in livestock business entitled to grazing permit). The reasons proffered by the Department of Interior in support of the change thus lack a reasoned basis.

The reduction in mandatory qualifications violates the Taylor Grazing Act and frus-

trates its purposes. The Department of Interior also has failed to provide a rational explanation for the change. Thus, the Court sets this provision in the 1995 regulations aside.

### VII. Exclusive Use of Water Diversions

The 1995 regulations provide that "[r]ange improvement work performed by a cooperator or permittee on the public lands or lands administered by Bureau of Land Management does not confer the exclusive right to use the improvement or the land affected by the range improvement work." 43 C.F.R. § 4120.3–2(d) (1995). Public Lands Council claims that prior regulations gave permittees the exclusive use of water-related range improvements like stock ponds and wells. Public Lands Council argues that the Department of Interior has reversed its earlier practice without a reasoned explanation.

■ A review of earlier regulations, however, reveals that permittees never had an exclusive right to use water-related range improvements. The prior regulation provided that "[t]he use by livestock of stock ponds or wells authorized by a range improvement permit shall be controlled by the grazing permittee or lessee holding the range improvement permit." 43 C.F.R. § 4120.3–3(c) (1994). Though not artfully worded, the plain language requires permittees to control their livestock's use of water-related range improvements; it does not grant permittees the right to control the improvement itself.

Further, the Department of Interior has never recognized exclusive use of water-related improvements as a form of range management. A permittee must obtain a permit or cooperative range improvement agreement before installing water-related range improvements on public lands. 43 C.F.R. § 4120.3–1(b) (1994). Such improvements must be compatible with multiple-use purposes, including wildlife habitats. *Id.* at § 4120.3–1(a). The Department of Interior thus required that water-related range improvements serve wildlife and other uses as a condition of obtaining a range improvement

permit. This is inconsistent with Public Lands Council's claim that permittees had exclusive control over water-related range improvements.

The 1995 regulations did not alter the Department of Interior's earlier practice without a reasoned explanation. Rather, they clarified existing practice. The Court cannot set this provision aside.

## VIII. Constitutional Claims

Public Lands Council claims that two of the 1995 regulations violate the Constitution. Public Lands Council asserts that 43 C.F.R. § 4140.1(c) (1995), which provides for suspension or cancellation of a grazing permit, violates the Double Jeopardy clause of the Fifth Amendment. Public Lands Council also asserts that 43 C.F.R. § 4130.8–1(d) (1995), which imposes a surcharge on certain pasturing agreements, violates the Due Process clause.

■ Because Public Lands Council challenges the facial validity of these regulations, it "must establish that no set of circumstances exist under which the [regulations] would be valid." *Reno v. Flores*, 507 U.S. 292, 301, 113 S.Ct. 1439, 1446, 123 L.Ed.2d 1 (1992) (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987)). "The fact that the [regulations] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render [them] wholly invalid." *Rust v. Sullivan*, 500 U.S. 173, 183, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (quoting *Salerno*, 481 U.S. at 745, 107 S.Ct. at 2100).

### A. Double Jeopardy

The 1995 regulations allow Bureau of Land Management officials to suspend or cancel a grazing permit or lease if the permittee or lessee is convicted of violating certain environmental laws. 43 C.F.R. § 4140.1(c)

(1995).[1] Public Lands Council claims that this constitutes a second punishment for the same offense, and therefore violates the Double Jeopardy clause.

■ Among other things, the Fifth Amendment to the U.S. Constitution provides that a person may not "be twice put in jeopardy of life or limb" for the same offense. U.S. Const. amend. V. However, this clause does not prohibit different sovereigns from pursuing successive prosecutions based on the same conduct. *Abbate v. United States*, 359 U.S. 187, 194–96, 79 S.Ct. 666, 668, 3 L.Ed.2d 729 (1959). A state could prosecute an individual for violating its environmental laws and the Bureau of Land Management could suspend or cancel that individual's grazing permit for the same conduct without violating the Double Jeopardy clause. Thus, the regulation could operate under at least one set of conceivable circumstances without violating the Constitution, so Public Lands Council's facial challenge to the regulation must fail. *See Rust*, 500 U.S. at 183, 111 S.Ct. at 1767.

■ Moreover, a civil sanction imposed after a criminal conviction does not necessarily violate the Double Jeopardy clause. If the civil sanction is remedial in nature and is rationally related to a legitimate governmental objective, it does not violate the Double Jeopardy clause. *United States v. Halper*, 490 U.S. 435, 449, 109 S.Ct. 1892, 1902, 104 L.Ed.2d 487 (1990). Here, the regulation bears a rational relationship to the Department of Interior's legitimate goal of encouraging permittees to act responsibly and obey federal and state environmental laws. The sanction is not punitive and does not violate the Double Jeopardy clause.

### B. Due Process

The 1995 regulations impose a surcharge on a permittee if he allows livestock not

---

1. This regulation actually outlines various federal and state environmental laws and provides that if a permittee violates one of these laws, he may be subject to civil penalties described in 43 C.F.R. § 4170.1–1 (1995). Section 4170.1–1, 43 C.F.R., gives BLM officials the authority to cancel or suspend grazing permits.

owned by him or his children to graze on public lands. 43 C.F.R. § 4130.8–1(d) (1995).[2] This surcharge recovers a portion of the profit realized from "pasturing agreements," where permittees pay a low rate to use public lands and market this right to others for a much greater amount. Public Lands Council claims that this regulation is overinclusive because it impacts a number of transactions that do not produce a profit and therefore violates the equal protection component of the Fifth Amendment's due process clause.[3]

█ An administrative classification that does not impact a fundamental right must be upheld if it is rationally related to a legitimate government goal. *Dandridge v. Williams*, 397 U.S. 471, 484, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970); *Artez v. Mulcrone*, 673 F.2d 1169, 1171 (10th Cir.1982). This is true even if the classification "is to some extent underinclusive and overinclusive." *New York Transit Authority v. Beazer*, 440 U.S. 568, 593 n. 39, 99 S.Ct. 1355, 1370 n. 39, 59 L.Ed.2d 587 (1979).

█ The surcharge regulation clearly has a rational basis. Reports issued by the General Accounting Office and the Interior Department Inspector General revealed that a significant number of permittees had profited from pasturing agreements and that the Bureau of Land Management failed to recover any portion of this profit. The reports determined that the Bureau of Land Management could reduce its operating deficit if it recovered a portion of these windfall profits.

Public Lands Council claims that the Department of Interior failed to respond to public comments criticizing the surcharge provision. However, the record indicates that the Department of Interior initially proposed a surcharge regulation that was much broader than the one it finally enacted. The Department of Interior received a number of critical comments and revised the surcharge regulation, narrowing it considerably. The Department of Interior adequately addressed public comments on this issue.

The surcharge regulation is rationally related to a legitimate government interest. The regulation does not violate the Fifth Amendment's Due Process clause.

## IX. Fundamentals of Rangeland Health

The 1995 regulations adopt a set of management standards called the Fundamentals of Rangeland Health (Fundamentals). 43 C.F.R. § 4180.1 (1995). The Fundamentals allow the Bureau of Land Management to modify grazing practices to ensure that: (1) watersheds function properly or are making significant progress toward proper function; (2) ecological processes, including hydrologic cycles, nutrient cycles, and energy flow are maintained to support healthy biotic communities; (3) water quality complies with state standards and meets wildlife needs; and (4) certain endangered species habitats are maintained or restored. *Id.* The 1995 regulations also provide that the Bureau of Land Management will adopt state or regional standards and guidelines (Standards and Guidelines) to address these same concerns. 43 C.F.R. § 4180.2 (1995).

If the Bureau of Land Management determines that grazing practices need to be modified, it "shall take appropriate action ... as soon as practicable but not later than the start of the next grazing year." 43 C.F.R. § 4180.1 (1995). Available actions include reducing livestock grazing, adjusting the grazing season, installing or moving range improvements, or developing alternative water sources. Public Lands Council concedes that the Bureau of Land Management has the authority to adopt the Fundamentals, but argues that the Bureau of Land Management

---

**2.** The surcharge equals "35 percent of the difference between the current year's Federal grazing fee and the prior year's private grazing land lease rate per AUM." 43 C.F.R. § 4130.8–1(d) (1995).

**3.** Although the Fifth Amendment does not contain an equal protection clause, it prohibits discrimination that violates due process. *Schneider v. Rusk*, 377 U.S. 163, 168, 84 S.Ct. 1187, 1190, 12 L.Ed.2d 218 (1964).

failed to respond adequately to comments criticizing the Fundamentals and the Standards and Guidelines.

The Bureau of Land Management gave the public notice of the proposed rule and the opportunity to comment on it. In response, the Bureau of Land Management received a wide range of comments, both positive and negative, regarding the Fundamentals. The Bureau of Land Management responded to these comments in the Final Environmental Impact Statement. The Final Environmental Impact Statement contains ten pages acknowledging and responding to criticism of the Fundamentals and the Standards and Guidelines. The Bureau of Land Management defended its methodology and explained why it made various choices.

■ The Court thus cannot say that the Bureau of Land Management failed to respond to critical comments. The adoption of the Fundamentals simply was not arbitrary and capricious.

## X. The Final Environmental Impact Statement

The National Environmental Policy Act (NEPA) requires federal agencies to prepare an environmental impact statement that analyzes the effect major federal actions have on the quality of the human environment. 42 U.S.C. § 4332(2)(C). Pursuant to this section, the Bureau of Land Management prepared a draft environmental impact statement (DEIS) and circulated this draft for public comment. After considering public response to the DEIS, the Bureau of Land Management revised it and issued a Final Environmental Impact Statement (FEIS).

■ Public Lands Council challenges the adequacy of the FEIS. Public Lands Council claims that the FEIS violates NEPA's requirements because it fails to: (1) address areas of scientific controversy; (2) address material public comments; (3) consider environmental effects of the 1995 regulations.

In the Tenth Circuit,

Judicial review of an EIS is limited to a consideration of the following: (1) does the EIS discuss all of the five procedural requirements listed in 42 U.S.C. § 4322(C); (2) does the EIS constitute a good faith compliance with the demands of NEPA; and (3) does the statement contain a reasonable discussion of the subject matter involved in the five respective areas?

*Johnston v. Davis,* 698 F.2d 1088, 1091 (1983) (quoting *Save Our Invaluable Land (SOIL), Inc. v. Needham,* 542 F.2d 539 (10th Cir. 1976)). The five specific issues that must be addressed are:

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C); *Holy Cross Wilderness Fund v. Madigan,* 960 F.2d 1515, 1521 (10th Cir.1992). NEPA does not require the agency to reach a particular result, "it simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989).

### A. Scientific Controversy

■ The Court need not decide "whether the [FEIS] is based on the best scientific methodology available, or resolve disagreement among experts." *Seattle Audubon Society v. Moseley,* 798 F.Supp. 1473, 1479 (W.D.Wash.1992). The Court need only ensure that the agency identified areas of scientific controversy and "respond[ed] to adverse opinions held by respected scientists." *Id.* at 1482.

■ Public Lands Council claims that the Bureau of Land Management failed to acknowledge, much less discuss, scientific controversy regarding: (1) current range conditions; (2) livestock grazing's effect on biological diversity; (3) livestock grazing's effect on wildlife and big game habitat and endangered species; and (4) whether the Fundamentals will help improve rangeland resources.

### 1. Current Range Conditions

The Bureau of Land Management acknowledged that "[m]uch controversy surrounds the interpretation of the true condition of the public rangelands." FEIS at 4. The Bureau of Land Management recognized that a number of commentators disagreed with its conclusion that current range conditions needed improvement. The Bureau of Land Management also considered the effect of other factors, such as fire, climate, and wildlife, had on the range. After considering all of these factors, the Bureau of Land Management concluded that new grazing regulations were necessary.

The Bureau of Land Management provided scientific and technical research to support its conclusions. Thus, the Court cannot say that the Bureau of Land Management violated NEPA in reaching its conclusions.

### 2. Biological Diversity

The Bureau of Land Management received a number of comments that criticized its conclusions about biological diversity. Public Lands Council concedes that the Bureau of Land Management responded to some of this criticism, but argues that the Bureau of Land Management did not acknowledge scientific controversy about the role livestock grazing plays in biological diversity. The Court cannot agree.

The Bureau of Land Management recognized that livestock grazing impacts biologi-

cal diversity and that proper livestock management can facilitate biological diversity. Public Lands Council criticizes the Bureau of Land Management's conclusion that a large disclimax[4] can harm biological diversity. However, the Bureau of Land Management responded to this criticism and defended its conclusion. Thus, the Bureau of Land Management acknowledged and responded to scientific disagreement on this issue.

### 3. Wildlife and Big Game Habitat

In the DEIS and FEIS, the Bureau of Land Management concludes that livestock grazing harms wildlife and big game habitat and has caused 75 different species to be listed as either threatened or endangered. The Bureau of Land Management received a number of comments that criticized these conclusions and responded to these comments.

The Bureau of Land Management recognized that big game populations remained stable but noted that wildlife species associated with grassland and riparian areas have declined. The Bureau of Land Management also admitted that livestock grazing may actually help some wildlife species and that livestock water diversions were not solely responsible for the decline of several species of fish. However, it did not change its conclusion that livestock grazing played a significant role in the decline of these fish. The Bureau of Land Management complied with NEPA because it acknowledged controversy and responded to it.

### 4. Fundamentals Impact on Rangeland Resources

As discussed in Section IX above, the Bureau of Land Management received a wide range of comment about the Fundamentals. The Bureau of Land Management adequately responded to these comments in the FEIS by acknowledging and responding to criticism of the Fundamentals as well as the

---

4. A "disclimax community" is defined as a "relatively stable ecological community that has displaced [the highest ecological development of a plant community] as a result of repeated or continuous disturbance by humans, domesticated animals, or natural events." DEIS at GL–7.

Standards and Guidelines. The Bureau of Land Management defended its methodology and explained why it made various choices. The Bureau of Land Management did not violate NEPA.

### B. Response to Public Comments

 Public Lands Council criticizes the way the Bureau of Land Management handled public comments on the DEIS, arguing that the Bureau of Land Management failed to distinguish between comments made by scientists and comments made by the general public. The Court finds that the Bureau of Land Management was not required to make such a distinction.

The Bureau of Land Management received a great many comments regarding the DEIS. The Bureau of Land Management received more than 20,000 pieces of mail and recorded more than 18,000 comments at public hearings. The Bureau of Land Management grouped and summarized these comments. The Court finds that this was a reasonable attempt to deal with the volume of comments. Further, the Bureau of Land Management's grouping of the comments makes it clear that range scientists were the source of a number of comments.

 Public Lands Council also argues that the Bureau of Land Management minimized the economic impact of the new regulations. However, the FEIS contains 29 pages discussing the economic and social impacts the new regulations would have on the livestock industry and communities that depend on the livestock industry. *See* FEIS at 111–140. The Bureau of Land Management therefore adequately responded to comments in this regard.

### C. Environmental Effects of the 1995 Regulations

The regulations implementing NEPA require agencies to consider the cumulative impact of agency action. The regulations define a cumulative impact as:

the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7 (1995).

 In other words, the Bureau of Land Management must consider the cumulative impact the 1995 regulations would have when added to agency action under other acts, such as the Wild and Free Roaming Horse and Burro Act and the Endangered Species Act. The DEIS and FEIS indicate that the Bureau of Land Management did this.

In the DEIS, the Bureau of Land Management stated that the various approaches to grazing regulation would have little impact on endangered species. DEIS at 4–9. Similarly, the Bureau of Land Management analyzed the cumulative effect of the new regulations and the Wild and Free Roaming Horse and Burro Act. The Bureau of Land Management determined that the new rules would allow for increased management of wild horses and burros and that these animals would disperse over larger areas and reduce the concentration of animals grazing in specific areas. DEIS at 36, 4–53. The Bureau of Land Management considered the cumulative impacts of the 1995 regulations; therefore, it did not violate NEPA.

### Conclusion

For the reasons set forth above, the Court **ORDERS** that the Secretary's decision to implement the 1995 regulations is **AFFIRMED IN PART** and **REVERSED IN PART.** The Court finds that the following portions of the 1995 regulations are unlawful and violate the Taylor Grazing Act: (1) the elimination of the grazing preference and replacement with the term "permitted use"; (2) the regulations providing that the United States shall have full title to all future range improvements; (3) the regulations providing

for conservation use permits; and (4) the regulations reducing the mandatory qualifications for a grazing permit.

Therefore, the Court **ORDERS** that these regulations are set aside and the respondents are enjoined from enforcing them. The remaining regulations do not violate the law or the Constitution and are not arbitrary or capricious.